UNITED STATES ANNUITY & LIFE INSURANCE COMPANY *v.*
PEAK.

## Opinion delivered May 7, 1917.

1.  APPEAL AND ERROR—FORMER APPEAL—DECLARATIONS OF LAW.—If on
    the second trial of a cause, after reversal and remand, the facts proved
    are the same as on the first trial, it is the duty of the trial court to
    instruct the jury peremptorily on the law as declared on the former
    appeal; but if the facts developed on the second trial are substantially
    different, then the trial court may apply a different rule of law.
2.  INSURANCE—LIFE INSURANCE—CONCEALMENT BY INSURED.—Knowl-
    edge by the insured that he had chronic Bright's disease at the time
    he accepted a policy of life insurance and concealed such fact, would
    avoid the same.
3.  INSURANCE—LIFE INSURANCE—HEALTH—CONCEALMENT.—Deceased
    made application for a policy of life insurance in appellant company,
    and the policy was issued, and after the lapse of some time was
    delivered to him.  In the meantime, deceased was examined by
    another physician for insurance in another company, who testified
    that he told deceased that he had chronic Bright's disease.  He died
    of Bright's disease about five months later.  *Held,* under the evidence
    that the jury was warranted in finding that deceased did not have a
    knowledge or belief that he had Bright's disease, which he intended to
    conceal from the appellant insurance company.
4.  APPEAL AND ERROR—FORMER APPEAL—NEW FACTS.—In a former
    appeal it was held that deceased knew at the time he accepted a
    policy of insurance on his life that he was suffering from chronic
    Bright's disease, but held on the second appeal that the evidence was
    such as to warrant the trial court in submitting to the jury the
    question of whether deceased did have such knowledge and belief
    as to his condition as amounted to concealment, and to support a
    finding that he did not have such knowledge.

Appeal from Chicot Circuit Court; *Turner Butler,*
Judge; affirmed.

*L. A. Stebbins* and *X. O. Pindall,* for appellant.

1.  This is the second appeal in this case.  123 Ark.
58; 122 *Id.* 58.  The law was settled there and the tes-
timony the same.  10 Ark. 186; 13 *Id.* 103; 14 *Id.* 515,
523-4; 44 *Id.* 383; 92 *Id.* 554; 123 S. W. 376; 99 Ark. 648;
97 *Id.* 147; 99 *Id.* 137; 102 *Id.* 547; 103 *Id.* 196; 107 *Id.*
310; 112 *Id.* 310; 120 Ark. 61.

2.  There is no new element in this case—the facts
are the same practically.

3. The court in its former opinion has gone to the extreme length possible under the authorities favorable to plaintiff. 1 Elliott on Contracts, § 125; 25 Cyc. 797; Richards on Insurance (3 ed.), § 100; Kerr on Ins., § 141, pp. 347-8; 130 Tenn. 325; 170 S. W. 474; L. R. A. 1915-C 153. The court overlooked these authorities that the material thing is not what the applicant believed, but what would have affected the action of the company.

4. The judgment should be reversed and the cause dismissed. 97 Ark. 147; 133 S. W. 596. The refusal to direct a verdict was in the face of the mandate of this court. 87 Ark. 70; 112 S. W. 176; 95 Ark. 456; 130 S. W. 532.

*Baldy Vinson* and *Garland Streett,* for appellee.

1. The instructions given were approved on the former appeal. The law is settled on the former appeal. 97 Ark. 147. But much new testimony was introduced and the proof is not the same. As to the facts the finding on the first appeal is not conclusive. 76 Ark. 377; 75 *Id.* 452.

2. The jury were properly instructed, and this court will not reverse the judgment on the evidence. 48 Ark. 495. A new trial will not be awarded unless there is a total want of evidence to sustain it. 15 Ark. 540; 19 *Id.* 671; 23 *Id.* 61; 24 *Id.* 251; 23 *Id.* 131; 40 *Id.* 168; 57 *Id.* 577; 34 *Id.* 632. The verdict is conclusive. 103 Ark. 4; 89 *Id.* 321; 103 *Id.* 538; 82 *Id.* 372; 92 *Id.* 586; 84 *Id.* 406; 90 *Id.* 100; 100 *Id.* 148. See also 87 Ark. 109; 97 *Id.* 438; 79 *Id.* 608.

*L. A. Stebbins, X. O. Pindall* and *N. B. Scott,* for appellant in reply.

1. The question of the sufficiency of the evidence is always a question for this court on appeal. 97 Ark. 438; 88 *Id.* 164; 87 *Id.* 101; 93 *Id.* 631; 79 *Id.* 357.

2. A jury can not arbitrarily disregard uncontradicted and consistent testimony. 67 Ark. 514; 80 *Id.* 396; 96 *Id.* 37; 101 *Id.* 352.

3. The evidence is the same. 79 Ark. 475; 37 Pac. 147; 148 S. W. 266; 73 Fed. 974, and many others. The law was not properly submitted to the jury. 79 Ark. 475; 96 S. W. 393-4; 103 Cal. 163, etc.

Wood, J. This is the second appeal in this case. The opinion on the first appeal is reported in volume 122, page 58, of the Arkansas Reports, where the facts as developed at the former trial are stated as follows:

"Appellee sued appellant to recover on a life insurance policy. The appellant is a life insurance company organized under the laws of the State of Illinois, and is authorized to transact business in the State of Arkansas. On August 14, 1913, Robert F. Peak of Readland, Arkansas, made application in writing to appellant for a policy of life insurance in the sum of $5,000, payable to his wife, Pearl S. Peak, as beneficiary. In his application he represented and agreed that his answers to questions propounded by the company's medical examiner should be true, and should be the basis of and the consideration for the contract of insurance applied for. On the same day Peak submitted to an examination by Dr. J. W. Nichols, the local medical examiner of the company. His medical examination, among other things, contained the following:

"Does the chemical examination of the party's urine show albumen or sugar (even in traces) or any abnormality?" "No."

"Doctor Nichols did not obtain a specimen of the applicant's urine on the 14th. He asked Mr. Peak for a specimen, but Peak, having passed his urine before he went to the doctor's office, could not furnish it at that time. The doctor suggested that he would go to Mr. Peak's house the next day to get a specimen, but Peak said he might be gone. The next morning the doctor received a specimen of urine represented to be the urine of Peak. The specimen was delivered to the doctor by Mrs. Annie Peak, the applicant's mother. Doctor Nichols

made a careful examination of the specimen of urine received by him from the applicant's mother on the morning of the 15th of August, 1913, and found it to be normal. He had no reason to suspect, after such examination, that Peak was afflicted with Bright's disease.

"On the 17th day of August, 1913, Peak was examined by Dr. C. P. Meriwether of Little Rock, Arkansas, for insurance in another company. Doctor Meriwether testified as follows:

" 'Peak looked to be in good condition. An examination, however, showed that his blood pressure was much higher than that of a normal man, and an examination of his heart showed an injured condition or hypertrophy. His urine was loaded with albumen and was of low specific gravity. I found no traces of sugar, but considerable albumen. I told Peak that he might have acute or chronic Bright's disease, and that he ought to go to his family physician, and that I could not tell much about it unless I should make a microscopical examination. I found all kinds of casts. I then told him I thought he had Bright's disease. He told me that he was going to Roswell, New Mexico, and I told him that he ought to be under medical treatment all of the time. We got a medical directory and decided upon a physician at Roswell to whom he should go for treatment. It is not a scientific and medical possibility that the urine of Mr. Peak could have been in a normal condition on the 15th day of August, 1913, in view of the condition I found on the 17th, taking into consideration the condition of his heart, coupled with what I discovered on the microscopic and chemical examination.'

"Mr. Peak's application for insurance in appellant company was finally accepted on the 5th day of September, 1913. His policy was signed on the 22d day of August, 1913, and was mailed to the State agent of the company in Arkansas on September 6, 1913. The policy was delivered to Mr. Peak by the local agent of the company

on the 17th day of September, 1913. The company first received information of Mr. Peak's physical condition as disclosed by the examination made by Doctor Meriwether on the 16th day of September, 1913. Immediately after it received the information on the 17th day of September, 1913, the company sent a telegram to its State agent to hold the policy for further instructions. The State agent called the local agent over the telephone and directed him not to deliver the policy. The policy, however, had been delivered a few hours before by the local agent to Mr. Peak.

"The insured died five months and two days after the policy was delivered to him, and Bright's disease of the kidneys caused his death. Mr. Peak executed a note for $151.40, payable to the order of J. L. Carter, the local agent of the company, for the first year's premium. The local agent and the State agent deposited this note as collateral security for money borrowed by them of a local bank. They remitted to the company its share of the proceeds. In other words, they paid to the company that part of the premium which went to it. The note in question provided that it should be paid in monthly installments, and the monthly installment due June 14, 1914, was not paid. The company went to the local bank where the note was deposited as security and paid the note. The note was returned to Peak by registered mail on June 29, 1914. He tried to pay it, but the agents of the company refused payment.

"Peak made no disclosure to the insurance company of what Doctor Meriwether had told him concerning his physical condition. If he had made such disclosure, the company would not have issued the policy and delivered it to him.

"Testimony was introduced on the part of the company tending to show that if Peak's condition on the 17th of August was as testified to by Doctor Meriwether, his urine could not have been normal on the 15th of August,

1913. Several physicians testified to this fact. A physician for appellee testified, however, that his condition might have been normal on the 15th, and that it was possible that there might have been a rise in his blood pressure in forty-eight hours, at the end of which time casts might show.

"Testimony was also adduced in favor of appellee tending to show that the specimen of urine furnished to Doctor Nichols was genuine. Evidence was also introduced tending to show that the reputation of the insured for truth and morality was good."

On the former appeal, among other things, we said:

"In the instant case the policy had not been issued, but the applicant had done all that had been required of him. We do not think he would be required, as a matter of law, to disclose to the company the result of a medical examination for insurance in any other company regardless of the fact whether or not he in good faith believed what the medical examiner had told him. For instance, when the applicant went to Doctor Meriwether and was examined by him for life insurance in another company, and Doctor Meriwether told him that he found albumen in his urine and other indications of Bright's disease, the applicant would not be required to state this fact to appellant company unless he believed it to be true; for, if he did not believe the statement made by Doctor Meriwether, he could not be said to conceal a material fact from the company. He might believe that his kidneys were only temporarily affected, and that the physician was mistaken in believing it to be Bright's disease.

"The testimony in the case before us, however, went further than this. After Doctor Meriwether had examined him and told him that the results of the examination indicated that he had Bright's disease, Peak became alarmed. Doctor Meriwether told him that he could not tell much about it until he made a microscopical examination, and as a result of this examination told him he

thought he had chronic Bright's disease.    The applicant then told him that he intended to go to Roswell, New Mexico, at once, and Doctor Meriwether selected a physi-cian to treat him for Bright's disease while he was out there.    Doctor Meriwether is a physician of good repu-tation, and there is nothing whatever in the record to dispute his testimony.

"So it may be said that the result of Doctor Meri-wether's examination of the applicant was to disclose to him that he had a fatal disease, the presence of which he could not be ignorant of, and the failure to disclose his knowledge that he had chronic Bright's disease was an intentional concealment on his part of a material fact, and his failure to communicate it to the company avoided the policy.    Under the undisputed facts, we think there was an element of knowledge on the part of the applicant that he had Bright's disease, and that there was an inten-tional concealment of this fact from the company."

Having reached the above conclusion, we reversed the judgment and remanded the cause for a new trial.

(1)    It thus appears that we held on the former appeal that under the undisputed facts there developed "there was an element of knowledge on the part of ap-plicant (Robert F. Peak) that he had Bright's disease, and there was an intentional concealment of this fact from the company," which avoided the policy.    The is-sues presented on the second trial are precisely the same as they were on the first trial, and if the testimony was the same, or substantially the same, then what we said on the former appeal is the law of the present case, and we could not change it on this appeal even if we were now convinced that the decision on the first appeal was erro-neous.    In other words, if the facts as developed by the testimony on the second trial of this cause were the same, or substantially the same, as disclosed on the first trial, then the appellant was entitled to have the jury told that the failure on the part of Robert F. Peak to disclose to

appellant that he had chronic Bright's disease was an intentional concealment of a material fact which voided his policy; and appellant was also entitled to a peremptory instruction for a verdict in its favor. Therefore, if the facts are substantially the same on this appeal as they were on the former appeal, the court erred in not granting appellant's prayers for such instructions under the familiar doctrine of law of the case as above announced, which has been repeatedly declared and followed by this court, and in some quite recent cases. *Carter* v. *Younger,* 123 Ark. 266, 271; *Morgan Engineering Co.* v. *Cache River Drainage District,* 122 Ark. 491, 499. See also numerous cases from our reports cited in appellant's brief.

But on the other hand, if the facts developed on the second trial are substantially different, then the trial court may apply a different rule of law. In the case of *Hartford Fire Ins. Co.* v. *Enoch,* 79 Ark. 475, we announced the familiar rule of law of the case as follows: "When on an appeal or writ of error a case is reversed and remanded for a new trial the cause stands as if no action had been taken by the lower court. If the facts developed on the second trial remain the same as they were on the first trial, the lower court must be governed in applying the law to the facts by the principles announced by this court in that case as controlling. If the facts are different, then the lower court may apply a different rule of law."

As already observed, we held on the former appeal that Peak had knowledge that he had chronic Bright's disease, which he intentionally failed to disclose to appellant. Is the testimony in this record on that issue substantially the same as it was in the record on the former appeal? The testimony is exceedingly voluminous, and it could serve no useful purpose to set it out in detail. Suffice it to say that by agreement of counsel all the testimony in this record was read in evidence from the record on the former appeal and in addition to the testimony of John L. Carter and Pearl S. Peak, which

was read from the bill of exceptions on the former appeal, they were introduced as witnesses and testified on the last trial, from which this appeal comes.

The testimony of witness Carter on the former appeal, so. far as it is material to discuss it here, shows that he, as the agent of appellant, jointly with Mr. Tichenor, who was the State's agent, took the application of Robert F. Peak for an insurance policy on his life with appellant in the sum of $5,000, which application was dated August 14, 1913; that the application was accepted, the policy issued, and delivered by witness to Robert F. Peak on the 17th day of September, 1913. On the last trial Carter testified as to the circumstances under which the application for insurance was made as follows: "I solicited this insurance of Mr. Peak. I went to Mr. Peak's place during the month of August, in company with Mr. Tichenor, who was then the State agent for the United States Annuity & Life Insurance Company. We made quite a few solicitations that day, and among the number was Mr. Peak. I found Mr. Peak at work, and after talking with him and showing him what I had and that he needed our policy, we finally persuaded him to make application for insurance and took his note therefor. We discussed with Mr. Peak the advantage of our policy over other old line policies and the value of old line policies over fraternal insurance."

Concerning the circumstances of the delivery of the policy, Carter testified as follows: "I do not remember that I saw Mr. Peak after his return from New Mexico at any time before I delivered the policy to him in my office in Eudora. When I received the policy from Mr. Tichenor I called him over the 'phone and advised him that the policy was there, as I knew he came to town once or twice a week, I told him if he would come around to the office the next time he was in town I would give him the policy. Three or four days later, or maybe a week, he came for the policy.

"In reply to your question as to whether or not he exhibited any great anxiety or made any effort to immediately get possession of the policy, it was three or four days, or probably a week, after I 'phoned him before he came to get the policy. He went away immediately after making the application, and if he made any demands at all for the policy I don't remember it. I had to ask him to come to my office to get it. I do not remember whether he made any inquiry for the policy between the time that he returned from New Mexico and the time I notified him to come to my office for it."

On the last trial Mrs. Pearl S. Peak testified as follows: "Robert F. Peak was my husband and died February 9, 1914. I was in New Mexico when my husband applied for the insurance policy upon which I am now bringing suit. My husband came to New Mexico August 19, 1913, and as far as any of us could tell he seemed to be feeling in perfect health—he looked well. I had been visiting in New Mexico from April until the latter part of August, and prior to his arrival in New Mexico I had not seen him since the latter part of April. Mr. Peak and myself stayed in New Mexico a little over two weeks. He was perfectly well. We took several trips and he never complained of feeling bad. He seemed to be in good spirits and was very cheerful. The trips to which I referred as being made with my husband while in New Mexico were thirty or forty mile trips made in a buggy to various ranches in the vicinity of Roswell. The country was very rough and mountainous, and these trips always tired me, but I did not see any evidence of unusual fatigue on the part of my husband.

"The first time I heard Doctor Meriwether's name mentioned was about a month after Mr. Peak returned from New Mexico, when he was notified that he had to have a second examination made. He explained about the examination being made in Little Rock. My husband and I returned from New Mexico about the 5th or

6th of September. I do not remember the exact date that my husband received the insurance policy, but I think Mr. Carter 'phoned to him at the house just two or three days after he came back, but he did not go after the policy until several days after that, as he was busy getting his work straightened out and could not go to Eudora after it."

It was shown on the first trial and also in the last trial that in January, 1913, Peak made application for insurance in the order of the Knights of Pythias, and was examined by Dr. H. H. Parr, a physician who had been practicing for ten years, and who was a graduate of Atlanta College, and was the regular examining officer for the Knights of Pythias. He made a careful examination of Peak's physical condition and made a chemical test of his urine for the purpose of testing for casts or albumen, and found nothing but a normal condition, and approved his application. Peak at that time obtained insurance in the Knights of Pythias in the sum of $5,000. Peak allowed the policy in the Knights of Pythias to lapse about the 31st of August, 1913.

The testimony tending to show the condition of Peak's health before he was examined by Doctor Meriwether in Little Rock, is precisely the same on the last trial as it was at the first. Up to that time two different physicians had examined him for life insurance and both found him in normal health and recommended him as a fit subject for insurance. The physician who examined him for the Knights of Pythias in January, 1913, made a chemical test of his urine and found nothing to indicate at that time that he had Bright's disease. Appellant's examining physician who examined him in August, 1913, also made a chemical test of what purported to be a specimen of Peak's urine and found the same in normal condition. The last examination was two days before he was informed by Doctor Meriwether that he had chronic Bright's disease.

The other testimony, by his wife and mother, who were most intimately associated with him, shows that before and up to the time he was informed by Doctor Meriwether that he had Bright's disease he had been in good health. His wife testified that from four to six months prior to August 14 his health seemed perfect, and during that year his health was fine. His mother testified that during the year 1913, and up to August, he was in perfect health, and at no time did he complain of any pain or illness; that the last time he was sick before he took out this insurance was in the fall of 1912.

So it may be said that until Peak was informed by Doctor Meriwether that he had chronic Bright's disease he had no reason to suspect that he was thus afflicted. The testimony as to Peak's physical condition from the time he was informed by Doctor Meriwether that he had chronic Bright's disease, August 17, 1913, down to the time of the delivery of the policy to him on September 17, 1913, was substantially the same on the last trial as it was on the first except in one particular hereafter mentioned. The only witness testifying to his condition of health during the above period was his wife, whose testimony on the last trial is as above set out, showing that when her husband arrived in New Mexico, on August 19, he looked well and seemed to be feeling in perfect health; that he did not complain of his health and did not consult a physician while he was in New Mexico; that up to the time he was examined by Doctor Parr, about the 18th of September, 1913, he had never shown any uneasiness or worry about his physical condition, and did not seem to realize it.

All of the above testimony on the last trial, showing Peak's physical condition before he was examined by Doctor Meriwether, and also showing his physical condition from the time he was informed by Doctor Meriwether that he had chronic Bright's disease, was directed to the issue as to whether or not Peak believed what Doc-

tor Meriwether had told him, and if this were all the testimony we would hold that the testimony at the last trial was substantially the same on this issue as at the first trial. But, as throwing light on the issue as to whether or not Peak believed that he had chronic Bright's disease, as he had been informed by Doctor Meriwether, we find that the following facts were developed on the last trial that were not in evidence on the first, towit: Mrs. Peak, on the last trial, testified: "I do not remember the exact date that my husband received the insurance policy, but I think Mr. Carter 'phoned to him at the house just two or three days after he came back, but he didn't go after the policy until several days after that, as he was busy getting his work straightened out and could not go to Eudora after it."

And John L. Carter testified: "When I received the policy from Mr. Tichenor I called him (Peak) over the 'phone and advised him that the policy was there, as I knew he came to town once or twice a week. I told him that if he would come around to the office the next time he was in town I would give him the policy. Three or four days later, maybe a week, he came for the policy. His physical condition seemed to be about the same as when Mr. Tichenor and myself saw him during the month of August and took his application. * * * It was three or four days, or probably a week, after I 'phoned him before he came to get the policy. He went away immediately after making the application, and if he made any demands at all for the policy I don't remember it. I had to ask him to come to my office to get it."

Carter further testified: "We discussed with Mr. Peak the advantages of our policy over other old line policies, and the value of old line insurance over fraternal insurance. We found Mr. Peak at work, and after talking with him and showing him what I had and that he needed our policy, we finally persuaded him to make application for insurance, and took his note therefor."

(2)   Now, if Peak had knowledge, and therefore believed, that he had chronic Bright's disease and concealed the same from the appellant, then his policy, under the law as declared by our decision on the former appeal was void.   Parties to contracts are presumed to know the law governing such contracts.   Assuming, therefore, as we must, that Peak knew such to be the law, if he believed that he had chronic Bright's disease and intended to perpetrate a fraud on appellant by concealing such knowledge, it is but reasonable to conclude that he would have been more anxious to secure the delivery of the policy after being informed by Carter that he held the same for delivery.   The testimony on both trials discovered that Peak, after he had been informed by Doctor Meriwether that he had chronic Bright's disease, allowed a policy which he held in the Knights of Pythias for $5,000 to be forfeited on the 31st of August, 1913, a little over two weeks before the policy in suit was delivered to him. Having allowed his policy in the Knights of Pythias to forfeit, the evidence warranted the conclusion that he had been convinced by the argument and persuasion of appellant's agents that a policy with appellant had superior advantages to fraternal insurance, and therefore that he had concluded to make application for such policy and to carry this line of insurance rather than his policy with the Knights of Pythias.

(3)   Knowing that a short while before he had permitted his policy in the Knights of Pythias to be forfeited, the conclusion is fairly deducible from the new testimony, at least the jury were warranted in finding such to be the fact, in connection with all the other evidence, that Peak did not believe that he had chronic Bright's disease, but, on the contrary, that he did believe that he was a fit subject for insurance and that his application with appellant company would be accepted and a policy in that company secured in lieu of the fraternal insurance which he had allowed to lapse.   The jury were

warranted in finding from this new testimony, in connection with all the other evidence, that the indifference manifested by Peak concerning the earliest possible delivery of the policy after it had been received by Carter was wholly incompatible with knowledge and belief on his part that he had chronic Bright's disease which he intended to conceal from appellant.

(4)    While the testimony on both trials was substantially the same as to Peak's looking and feeling in perfect health and making no complaint while in New Mexico, yet there is an additional fact discovered by the new testimony which the jury might have found furnished a concrete basis for a belief on Peak's part that he did not have Bright's disease. . He was able to make thirty to forty mile trips in a buggy over rough mountainous country without any evidence of unusual fatigue.

On the last trial the above additional fact was brought out by Mrs. Peak as to what Peak actually did showing his physical ability to make mountain journeys without evidence of fatigue. The jury might have found from this new testimony that it would have been a reasonable conclusion on Peak's part that he did not have chronic Bright's disease, as informed by Doctor Meriwether. For if he had been so diseased, he would have been entirely unable to make those arduous mountain trips without fatigue, as indicated by this new testimony of Mrs. Peak.

We conclude, therefore, that on the last trial new testimony was introduced materially and substantially different from that adduced on the former trial, which justified the court in refusing appellant's prayer for a peremptory instruction and warranted the court in submitting to the jury the only issue that was left for them to determine under our former opinion, that is, as to whether or not Peak believed that he had chronic Bright's disease as he had been informed by Doctor Mer-

iwether. The testimony developed at the last trial made this an issue of fact for the jury, which the court very fully and correctly submitted for their determination.

The judgment is therefore correct and it is affirmed.