Rolinda KIGHT *v.*
ARKANSAS DEPARTMENT OF HUMAN SERVICES

CA 05-522                                           231 S.W.3d 103

Court of Appeals of Arkansas
Opinion delivered March 8, 2006

[Rehearing denied August 30, 2006.*]

---

* PITTMAN, C.J., concurs. BIRD and HART, JJ., would grant rehearing.

*Glen Hoggard*, for appellant.

*Gray Allen Turner*, for appellee.

*Jennifer Hill Kendrick*, Attorney Ad Litem, for minor children.

ANDREE LAYTON ROAF, Judge. Appellant Rolinda Kight appeals from the Faulkner County Circuit Court's order terminating her parental rights to her two minor children, A.W. and L.M. This is the second time this case has been before this court. In *Kight v. Ark. Dep't of Human Servs.*, 87 Ark. App. 230, 189 S.W.3d 498 (2004) (*Kight I*), this court reversed and remanded this case and directed that reunification services be continued. Appellee Arkansas Department of Human Services (ADHS) filed another petition to terminate Kight's parental rights, which the trial court granted. For reversal, Kight argues that the trial court erred in terminating her

parental rights (1) by not following the mandate of this court from the prior appeal and (2) by violating her due-process rights. We affirm.

After reversal of the prior termination order, ADHS sought rehearing and also sought review by the supreme court. ADHS learned that the supreme court had denied review on September 24, 2004. At a review hearing on November 23, 2004, the trial court inquired into the status of the case. ADHS informed the court that the only order affected by this court's reversal was the order that terminated Kight's parental rights and that all other prior orders remained in effect, including the order for no reunification services. At this hearing, ADHS also announced its intention to file a second petition to terminate Kight's parental rights, and it did so the same day. The trial court stated that it would have a hearing on January 18, 2005, to determine whether there should be reunification services offered in this case. This hearing was subsequently continued until February 3, 2005. The February 3, 2005, hearing was thus for the purpose of deciding whether to terminate Kight's parental rights. At this hearing, Kight objected to the termination petition, arguing that reunification services had not been offered to her in compliance with this court's mandate.

Linda Wallace, a social worker assistant, testified at the hearing that the first meeting she had with Kight since this case had been re-opened was at McDonald's, Kight's place of employment at the time. Wallace drove Kight home to take a drug test that came back negative. Kight subsequently refused several drug tests, telling Wallace that her attorney had told her to refuse any drug tests administered by ADHS because of their unreliability. Wallace saw Raymond Morgan, a convicted drug dealer, at Kight's home on two occasions in the early morning hours, although Wallace never saw any evidence that he was living with Kight. Wallace, on at least one occasion, went to Kight's home at 4:50 a.m. to administer a drug test. According to Wallace, that was a good way to "catch some people" at home. Wallace found out from a neighbor that Kight had changed jobs and was working for Burger King. Wallace testified that sometimes she would have trouble getting in touch with Kight. Wallace had contact with Kight on at least nine different occasions between November 3, 2004, and January 26, 2005. She testified that some of these contacts were for drug tests and some of them were "just to see how [Kight] was doing." Wallace found out through Kight's neighbor and then from Kight, that Kight had found a job through a temporary agency working at the Peabody Hotel.

According to Wallace, there were no recent drug problems or problems with Kight's environment. The only problem Wallace identified was that Kight had changed jobs frequently. She had had three different jobs and two residences over the past three months. Wallace testified that she thought Kight was trying and that she was doing a good job. She also stated that she had no complaints about Kight.

There was testimony at the hearing that A.W. and L.M. were thriving in the care of the foster parents. They had been in the same foster home for at least two years and five months.

Laura Rogers, a family services worker, testified that she was concerned about Kight's association with Raymond Morgan. She stated that Kight had tested positive for THC at the time of the first review hearing in November 2004. Kight had refused all other drug tests ADHS had attempted to do since October 2004, explaining to Rogers that her former attorney had told her not to submit to any drug tests administered by ADHS because they resulted in false positives. Rogers stated that she could not "really tell [Kight] what reunification services [ADHS] could even offer since the goal of the case [was still adoption]." Rogers testified that, during her meetings with Kight, Kight never asked about the welfare of her children. Kight did not have a car, and Rogers drove her to one hearing, and Wallace drove her to another hearing. According to Rogers, the trial court did not allow visitation to Kight, and Kight and her attorney had not asked for any service except transportation. Rogers testified that, at the time of the hearing, A.W. had been in foster care for two years and five months and that L.M. had been in foster care for a little over two years. According to Rogers, offering additional services to Kight would not result in a successful reunification. As far as the services that were offered to her after her case was remanded, Rogers stated that those services began in mid-October with home visits and drug testing.

Kight testified about her employment history since July 2003. She worked at American Plastics until September 2003, when she had to resign because she lacked transportation. She then went to work for Jackson Cookie Company. When this company went out of business early in 2004, she began working for the Peabody Hotel, where she worked part-time from March 2003 in addition to working at McDonald's and Burger King. The Pea-

body had hired her for full-time employment, while she worked banquets for different employers and did housekeeping for other hotels on the weekends.

Kight testified about a short period of unemployment around October 2003 when she fell down some stairs and broke her ankle. However, after being confronted by ADHS with faxed hospital records, Kight admitted on cross-examination that she had not broken her ankle falling down stairs but that she had jumped off the top of a moving vehicle when she had tried to prevent a male guest from leaving her apartment.

In July 2003, Kight lived at Chance Sobriety. When she completed that program, she lived with her uncle, different friends, and with her mother. In November 2003, she lived in her own apartment, with an apartment mate. She began living in an apartment by herself in August 2004, where she stayed until she moved into a house in North Little Rock. She testified that she allowed Raymond Morgan to help her move some heavy furniture into the house because she could not move it by herself. According to Kight, she had seen Morgan approximately five times since July 2003 but had not been romantically involved with him since June 2003. She testified that she could not explain the one positive drug screen in November 2004 and that she had been clean and sober for two years. ADHS was successful in preventing Kight from introducing the negative results of a hair-follicle drug test she had had done at her own expense in January 2005 after the positive test occurred in November 2004.

After hearing the testimony, the trial court terminated Kight's parental rights, finding that it was in the children's best interests; that there was little likelihood that services to the family would result in successful reunification; that the children had been adjudicated dependent-neglected, had been out of the home for more than twelve months, and that despite a meaningful effort by ADHS to rehabilitate the mother and correct the conditions that caused removal, the mother had failed to remedy the conditions.

The standard of review in termination-of-parental rights cases is well-settled. In *Johnson v. Arkansas Department of Human Services*, 78 Ark. App. 112, 119, 82 S.W.3d 183, 187 (2002), the court held:

> When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party to terminate

the relationship. Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. The facts warranting termination of parental rights must be proven by clear and convincing evidence, and in reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous. Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established. In resolving the clearly erroneous questions, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses. Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations.

An order forever terminating parental rights must be based upon clear and convincing evidence that the termination is in the best interests of the child, taking into consideration the likelihood that the child will be adopted and the potential harm caused by continuing contact with the parent. In addition to determining the best interests of the child, the court must find clear and convincing evidence that the circumstances exist that, according to the statute, justify terminating parental rights. One such set of circumstances that may support the termination of parental rights is that the child has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months, and despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent. It is not necessary that the twelve-month period out of home be consecutive. (Citations omitted.)

Arkansas Code Annotated section 9-27-341 (Supp. 2003) states:

(b)(1)(A) The circuit court may consider a petition to terminate parental rights if the court finds that there is an appropriate permanency placement plan for the juvenile.

. . . .

(3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:

(A) That it is in the best interest of the juvenile, including consideration of the following factors:

(i) The likelihood that the juvenile will be adopted if the termination petition is granted; and

(ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent, parents, or putative parent or parents, and

(B) Of one (1) or more of the following grounds:

(i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

For her first point on appeal, Kight argues that the trial court erred by not following this court's mandate to continue reunification services. A lower court is bound to follow the mandate of a superior court, and jurisdiction conferred on the trial court upon remand is bounded by the mandate and decision of the superior court. *City of Dover v. A.G. Barton*, 342 Ark. 521, 29 S.W.3d 698 (2000). When an appellate court remands a case with specific instructions, those instructions must be followed. *Id.* A lower court is bound to follow both the letter and spirit of the opinion and mandate. *Id.* The trial court should look beyond the words of reversal and look to the effect of the opinion in proceeding upon remand. *Glover v. Woodhaven Homes, Inc.*, 346 Ark. 397, 57 S.W.3d 211 (2001) (quoting *Kneeland v. Am. Loan & Trust Co.*, 138 U.S. 509 (1891)).

Kight asserts that the trial court did not follow the remand's specific instructions. This court stated in its opinion, "We reverse and remand this case with instructions to the trial court to continue reunification services." *Kight I, supra.* However, ADHS took the position that the no-reunification order was still in effect because this court only reversed the termination order. Kight argues that it is clear from the record that ADHS never intended to offer meaningful reunification services. We must agree with Kight. When the trial court inquired as to ADHS's plan for the case at the November 23, 2004 review hearing, ADHS stated that it anticipated filing another termination petition, and it did so the same day. This occurred only two months after our supreme court denied ADHS's petition for review and only six days after counsel had been appointed to Kight in the present case.

Moreover, the trial court specifically forbade visitation between Kight and her children and never conducted a separate hearing to determine whether reunification should have still been the goal of the case. Instead, it held a termination hearing on February 3, 2005. The court never required ADHS to continue reunification services, and, in fact, ordered that Kight not visit her children.

ADHS again contends on appeal that it did provide reunification services to Kight. This argument contradicts its assertions to the trial court at the November 2004 hearing. At the February 2005 termination hearing, however, ADHS took the position that reunification services had been offered from the time the case came back from the supreme court, which was September 24, 2004. ADHS characterized the home visits, drug test, ten attempted drug tests, and transportation to the two hearings as reunification services.

ADHS clearly did not continue reunification services, despite its argument to the contrary. This court found in *Kight I, supra,* that Kight was committed to remaining clean and sober and that she was not given a reasonable time to demonstrate that the children could safely be returned to her home.

Nevertheless, it must be noted that Kight does not challenge the sufficiency of the evidence to terminate her parental rights or the finding that it was in her children's best interests to terminate her rights. She only argues that the trial court erred by not following this court's mandate and that the trial court's decision violated her due-process rights. The children in this case have now

been out of the home since January 8, 2003, which means that they have been out of the home for approximately three years, and L.M. has been out of the home since she was born. Although the delay in this case is primarily attributable to ADHS and the trial court in erroneously terminating Kight's rights in the first place, from the children's perspective, they clearly cannot now be returned to the home in a reasonable amount of time. *See* Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2003). Moreover, it is significant that the problem that caused the removal of Kight's children involved her drug usage both prior to and during the pendency of the earlier proceedings. Kight had tested positive for cocaine and THC, and at the time she gave birth to L.M. in January 2003, both she and L.M. testified positive for cocaine. Subsequent to remand of this case, although she denied any drug use, Kight tested positive for THC when tested at the time of her first review hearing after remand, and she refused all subsequent drug tests. The trial court additionally found Kight not credible after she lied under oath about the circumstances of her ankle injury.

■ We remanded this case with the specific instruction to continue reunification services. It is very clear that ADHS did not follow the spirit or letter of this court's opinion or its mandate in offering what it now deems the "reunification services" of drug tests, two rides to hearings, and investigatory home visits. Kight was employed full-time and had her own home that she had furnished at the time of the termination hearing, so it is unclear what additional services she would have been seeking, other than visitation with the children. However, we cannot say that, under the evidence presented at the termination hearing, it was reversible error to terminate Kight's rights without ordering further services to her at that time, despite the outrageous and contemptuous conduct of ADHS in this case.

Kight also argues that the trial court's decision violated the due-process rights provided by the Fourteenth Amendment of the United States Constitution by (1) denying her a meaningful opportunity to be heard on the issue of the mandate's requirement of continued reunification services and (2) requiring her to observe a standard of conduct during the pendency of her appeal that is without precedent or statutory authority. ADHS argues that this argument is not preserved, because Kight failed to raise it at the trial level. Kight's attorney, however, did ask the trial court to strike all testimony in the record regarding Kight's behavior from July 15, 2003, the day her rights were first terminated, until

November 23, 2004, the date of the first review hearing after remand, because Kight had no notice that she was to comply with any code of conduct during this period. Kight's attorney argued that this violated her due-process rights. The trial court overruled Kight's motion to strike the record.

■ Kight argues also that no meaningful hearing was provided to consider the issue of reunification services. In *Mayberry v. Flowers*, 347 Ark. 476, 65 S.W.3d 418 (2002), the supreme court held that due process requires, at a minimum, notice reasonably calculated to afford a natural parent the opportunity to be heard prior to parental rights being terminated. Here, Kight does not suggest that she did not have notice of the hearing; she only argues that she did not have an opportunity to be heard regarding the continuation of reunification services. At the termination hearing, however, Kight was given the opportunity to voice her objection to the fact that the trial court failed to order a continuation of reunification services and that those services were not provided to her. Moreover, Kight cites no convincing authority for her argument that she was denied due process because there was no separate hearing held specifically to address the fact that the trial court did not order the continuation of reunification services as mandated by this court.

■ Kight further asserts that the trial court applied a standard of conduct to her without giving her any notice of the standard. Kight's parental rights were suspended from July 15, 2003, when the first termination order was entered, until this court reversed the termination order in June 2004. Kight argues that even though she possessed no parental rights during this time, the trial court gave much weight to her conduct during this period. It is important to note, however, that Kight was aware that her case was in the appeal process. There is no evidence that the trial court imposed a particular standard of conduct on Kight. Kight's employment history and stability and her ability to maintain stable housing were proper factors for the trial court to consider in the termination hearing. Kight was given the opportunity to be heard at this hearing. We therefore cannot say that the trial court deprived Kight of her parental rights without due process.

In sum, these children have now been out of Kight's care and custody and with a foster family for three years. L.M. has been

with the foster family since she was released from the hospital after her birth. Neither child has seen Kight in over two years. The supreme court recently noted in *Linker-Flores v. DHS*, 364 Ark. 224, 217 S.W.3d 107 (2005), involving a case that had gone on for over four years:

> Such a delay goes against the clear legislative intent of the termination-of-parental-rights statute, which specifically states:
>
> > The intent of this section is to provide permanency in a juvenile's life in all instances where the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark. Code Ann. § 9-27-341(a)(3).

Unfortunately, the delay in this case was in large measure caused by ADHS. Nevertheless, under the circumstances and evidence presented at the termination hearing, we cannot say the trial court erred in terminating Kight's parental rights based on either of the arguments she has raised in this appeal.

Affirmed.

GLOVER, J., agrees.

PITTMAN, C.J., concurs.

JOHN MAUZY PITTMAN, Chief Judge, concurring. I agree that the trial court's decision should be affirmed. However, I cannot agree with the majority's statement that the termination of parental rights must be affirmed because the trial court "erroneously [terminated] Kight's rights in the first place" and therefore caused irremediable delay. It is true that matters decided on our prior appeal are the law of the case and govern our actions on the present appeal to the extent that we would be bound by them even if we were now inclined to say that we were wrong in those decisions. *Lunsford v. Rich Mountain Electric Coop*, 38 Ark. App. 188, 832 S.W.2d 291 (1992). However, if blame is to be placed on a court for the delay caused in this case, we should place a good deal of it on ourselves. Our prior opinion in this case was largely based on *Trout v. Arkansas Department*

*of Human Services,* 84 Ark. App. 446, 146 S.W.3d 895 (2004), where we held that the trial court erred by disregarding appellant's eleventh-hour progress made toward reunification. That case, however, was reversed by the Arkansas Supreme Court in an opinion that expressly held that the trial court was not bound to attach significant weight to such tardy improvements, and which restated the fundamental principle that we give great deference to the superior position of the trial court, through observation and extended experience with the parties, to determine whether last-minute efforts are sincere, or instead merely a ruse to prevent imminent termination of parental rights. *Trout v. Arkansas Department of Human Services,* 359 Ark. 283, 197 S.W.3d 486 (2004).

In our prior opinion in this case, we erred by giving more weight to our hopes regarding appellant's sincerity than we did to the trial judge's experience and ability to see, hear, and judge first-hand whether or not her efforts to maintain sobriety were made in good faith. Insofar as we ourselves erred in our prior opinion by eschewing the principles enunciated by the supreme court in *Trout,* I believe that we bear a measure of responsibility for the resulting delay.

Nor do I agree with the majority's statement that the conduct of the Arkansas Department of Human Services in this case following remand was "outrageous and contemptuous." It is true that the ADHS attorneys had no reasonable basis for arguing that our mandate did not require ADHS to provide additional reunification services. Nevertheless, the fact remains that ADHS agents in the field did attempt to provide reunification services by re-instituting drug testing of appellant as a prerequisite to visitation. Insofar as the removal in this case was occasioned by appellant's inability to provide proper parenting because of her illegal drug use, the resumption of drug tests was the essential first step on the road to reunification. Appellant, by her refusal to submit to these tests, precluded any meaningful attempts at reunification. I submit that appellant, too, has responsibilities as well as rights, and that her outright refusal to cooperate with the additional reunification efforts ordered by this court in our prior opinion was far and away the most "outrageous and contemptuous" behavior exhibited by any of the parties to this case.

I concur in the result reached by the majority.

## SUPPLEMENTAL CONCURRING OPINION
## ON DENIAL OF REHEARING
### AUGUST 30, 2006

JOHN MAUZY PITTMAN, Chief Judge, concurring. I agree that the decision to affirm this case was correct, but I do so for the reasons set out in my concurrence to the opinion delivered on March 8, 2006 (*Kight II*), and not for the reasons stated by the majority. It is true that the ADHS attorneys had no reasonable basis for arguing that our mandate did not require ADHS to provide additional reunification services. Nevertheless, the fact remains that ADHS agents in the field did attempt to provide reunification services, and were stymied in their attempts to do so by appellant's own refusal to cooperate. These new circumstances resulted in a second petition to terminate appellant's parental rights based on events that occurred subsequent to the prior termination hearing. Given that the termination order under review was based on subsequent events, it was not barred by our initial mandate.

The initial removal of the children in this case was occasioned by appellant's inability to provide proper parenting because of her illegal drug use. This court's original opinion held, erroneously,[1] that appellant had corrected her drug-abuse issues; that a

---

[1] This is not to suggest that this court's initial order is not binding because it was erroneous. It is axiomatic that a decision of an appellate court establishes the law of the case for trial upon remand and for the appellate court itself upon subsequent review; on the second appeal, the decision of the first appeal becomes the law of the case and is conclusive of every question of law or fact decided in the former appeal, and also of those which might have been, but were not, presented. *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). This court's decision in the first appeal ordered that appellant be provided with services designed to remedy her inadequacies and permit her children to be returned to her custody. Implementation of this order, however, was made impossible by appellant's subsequent refusal of services. For over one hundred and fifty years, it has been the law in the State of Arkansas that the doctrine of law of the case does not bind the inferior court with respect to matters arising subsequent to the decision of the appellate court. *Cunningham v. Ashley*, 13 Ark. 653 (1853). One hundred years ago, the Arkansas Supreme Court held that an appellate court's judgment is not controlling on retrial where the evidence on the issue presented is materially different. *Hartford Fire Insurance Co. v. Enoch*, 79 Ark. 475, 96 S.W. 393 (1906). This rule was repeated in 1923 in *Carter v. Bates*, 158 Ark. 640, 249 S.W. 355 (1923), and again in 1986 in *Potter v. Easley*, 288 Ark. 133, 703 S.W.2d 442 (1986).

Without a doubt, the trial court was required by our mandate in *Kight I* to provide reunification services. However, it is a familiar maxim of the law that *lex non cogit ad*

relapse into drug use while services were being offered was insufficient to terminate parental rights; and that it was speculative to believe appellant would continue a relationship with her co-caine supplier, Raymond Morgan. *See Kight v. Arkansas Department of Human Services*, 87 Ark. App. 230, 189 S.W.3d 498 (2004) (*Kight I*). As it happened, after this court's erroneous holding it came to pass that appellant did in fact resume her relationship with Raymond Morgan, who was seen at her home on two occasions in the early morning hours.

Clearly, whether the trial court expressly ordered it or not, appellant's case *was* reopened by ADHS after this court's mandate issued. Even before our mandate issued, ADHS began attempting to locate appellant in July 2004 as soon as it became aware of our decision in *Kight I*. At a review hearing on August 31, 2004, ADHS advised the trial court that, although appellant was aware of the reversal and had been in contact with her attorney, she could not be located and had not contacted ADHS. Appellant finally contacted her caseworker on October 20, 2004. The Department was ready and willing to resume visitation between the appellant and the child. However, because drug use had been the major cause of the termination of appellant's parental rights, drug testing was a prerequisite to visitation. At a meeting arranged by her caseworker shortly thereafter, appellant was informed that drug testing services would be resumed. This offer was angrily rejected by appellant, who refused to take any drug test given by ADHS, stating that such tests were a nuisance that "interrupt[ed] her plans." Although appellant had not seen her children for approximately eighteen months at the time of the meeting, appellant did not mention or inquire about them at the meeting. Appellant was offered, and refused, drug tests on November 3, 6, 9, 17, and 21. Appellant attended a staffing meeting conducted by ADHS on November 17.

---

*impossibilia,* and appellant's refusal to accept those services made it impossible for the trial court to comply with our mandate. This refusal constituted a change in the circumstances presented in *Kight I,* where appellant presented herself as a recovered drug-abuser who had been guilty only of minor backsliding and who earnestly desired more time to comply with the case plan. To characterize appellant's conduct as the same allegations concerning appellant's drug abuse that were the subject of *Kight I* is to refuse to acknowledge the elementary difference between a mother asking for more time to recover from drug abuse, as opposed to a mother who, on remand, utterly refuses to cooperate in that recovery.

A family services worker with the Division of Child and Family Services testified that appellant was intoxicated at that meeting, exhibiting slurred speech and a smell of alcohol on her breath and her clothing. Although she was, as a result, directed to report to the police department to take a breathalyser test, appellant failed to do so. Appellant refused all voluntary drug testing, but was required to submit to a drug test by the trial judge when she appeared at a hearing on November 23, 2004. Although appellant flatly denied any drug use when she testified at the hearing, the results of that drug test were positive. Home visits, necessary for the resumption of visitation with the children, were also offered by ADHS, but appellant at times refused to come to the door of her home even though she could be heard inside. Appellant did not respond to notes left on her door or to messages left on her cell phone.

Appellant, by her refusal to submit to drug testing or cooperate in other necessary services, precluded any meaningful attempts at reunification. The law does not require a vain and useless act, *Noble v. State*, 326 Ark. 462, 932 S.W.2d 752 (1996), and, as I noted in my concurrence in *Kight II*, I believe appellant's refusal to cooperate with the reunification services ordered by our mandate made reunification impossible and supported the trial court's grant of the second petition to terminate her parental rights.

## SUPPLEMENTAL DISSENTING OPINION
## ON DENIAL OF REHEARING
## AUGUST 30, 2006

SAM BIRD, Judge, dissenting. I respectfully disagree with the majority's decision to deny appellant's petition for rehearing. A review of the pertinent history of this case is necessary for a full understanding of this dissent. On July 31, 2003, the Circuit Court of Faulkner County entered orders terminating the parental rights of Rolinda Kight to her two children. Kight appealed those orders to this court. In *Kight v. Arkansas Department of Human Services*, 87 Ark. App. 230, 189 S.W.3d 498 (2004) (*Kight I*), after concluding that we were "left with a firm conviction that a mistake has been made" by the trial court in terminating Kight's parental rights, we reversed the trial court

On November 23, 2004, the trial court convened a review hearing to consider the status of the case. At that hearing, DHS argued that our reversal of the July 31, 2003, orders terminating Kight's parental rights had no effect on an earlier order of the court that had suspended reunification services. DHS's argument is reflected in the following colloquy between the court, DHS's attorney (Finkenbinder), the attorney ad litem (Kendrick), and Kight's attorney (Heimbaugh):

THE COURT: What is your position, Mr. Finkenbinder, about reunification services? What are you asking for?

MR. FINKENBINDER: Your Honor, the last order of the court suspended reunification — suspended reunification services. The order of the Court of Appeals only reversed the termination order. What that means is, and the Department's view is, that all orders prior to the termination order remain in effect.

THE COURT: You're going to have to break that down into simple language. Which means what?

MR. FINKENBINDER: Which means that all the orders prior to the termination remain in effect. The case didn't go away. All the Court of Appeals did was say that the termination is reversed, so all the previous orders about drug testing and things of that nature remain in effect. The Court had already ordered no reunification.

MS. KENDRICK: Your Honor, the no-reunification order was not appealed, at all, or even addressed, so I would assume that it is still in effect. I mean, with her given the chance, you know, she can do what she can do now and she has a new attorney. But until — I don't know it doesn't make a lot of sense.

THE COURT: I tell you what, I'm going to give Ms. Heimbaugh a chance to look into this. All of those briefs are in my office and you can have them all.

Ms. HEIMBAUGH: All right. Because I need to see why the TPR was overturned. If it was overturned for something like no reunification services, then that argument's moot.

THE COURT: Well, let's put this out for three or four weeks and let Ms. Heimbaugh have an opportunity to go over all the documents and I'll give her all the briefs that I have in my office, as well as the mandate from the Court of Appeals.

The court continued the hearing until January 18, 2005, and announced that the hearing on that date would "be a hearing on whether or not there would be reunification." Before the hearing was adjourned, DHS advised the court that it would be filing a petition for no-reunification services or another petition for termination of parental rights, or both. The court announced that there would be no visitation between Kight and her children until after the January 18 hearing "because I think, depending on the outcome of that hearing, we'll either start fresh or we'll not start fresh. . . ." Six days later, on November 29, 2004, DHS filed another petition to terminate Kight's parental rights.

On February 3, 2005,[1] the court again convened to consider this matter. DHS announced that the purpose of the hearing was for the court to hear evidence on DHS's November 29, 2004, petition to terminate Kight's parental rights, while Kight argued that DHS's new termination petition should not be considered because reunification services had not been resumed as directed by this court's mandate, and that the termination petition should be dismissed. The court denied Kight's motion to dismiss the termination petition filed on November 29, 2004, and proceeded to hear evidence on it.

---

[1] The January 18, 2005, hearing was continued at Kight's request because her mother was having surgery.

By orders signed February 10 and entered February 14, 2005, the Faulkner County Circuit Court granted DHS's November 29, 2004, petition, again ordering that Kight's parental rights to her two children be terminated. Kight appealed from those orders, arguing principally that the trial court had not followed the mandate of this court's June 30, 2004, opinion that reversed the trial court's termination of Kight's parental rights and directed that reunification services be continued. In *Kight v. Arkansas Department of Human Services*, 94 Ark. App. 400, 231 S.W.3d 103 (2006) (*Kight II*), a three-judge panel of this court affirmed the trial court's second termination of Kight's parental rights. By a vote of four to two, this court has now decided to deny Kight's petition for rehearing. It is our denial of rehearing from which I dissent.

The reason for my dissent is quite simple: On June 30, 2004, we held that the trial court's decision to terminate Kight's parental rights to her two children was "clearly erroneous," and we remanded the case with specific instructions to the trial court to "continue reunification services." Instead of doing what we un-ambiguously directed it to do, the trial court held a hearing to examine the meaning of our decision. At that hearing, DHS's attorney made the absurd argument that our June 30, 2004, reversal of the termination of Kight's parental rights and our express direction to "continue reunification services" *did not* have the effect of reversing a pre-termination order of the trial court that had suspended reunification services to Kight.[2] Instead of ordering that reunification services be resumed pursuant to our mandate, the trial court decided that it should hold a hearing to decide "whether or not there should be reunification." Then, on the date scheduled for the "reunification" hearing, the court, instead of considering the issue of reunification services, pro-ceeded to hear evidence, over Kight's objection, on DHS's second parental termination petition filed November 29, 2004. Following that hearing, the trial court again terminated Kight's parental rights to her two children.

The majority of this court acknowledges that the trial court is bound by our decision in *Kight I* as the law of the case.

---

[2] I have searched the record of both *Kight I* and *Kight II* but do not find an order of the trial court that suspended reunification services by DHS to Kight's children.

Nonetheless, even while expressly recognizing that the trial court declined to order the continuation of reunification services as required by our mandate, the majority has decided to affirm the trial court's second termination of Kight's parental rights.

The majority justifies its decision to disregard the law of the case by pointing out that Kight does not now challenge the sufficiency of the evidence upon which the trial court based its second decision to terminate her parental rights. I disagree that Kight was obligated to challenge the sufficiency of the evidence that resulted in the second termination of her parental rights in order to obtain a reversal of the trial court's decision. In *Wal-Mart Stores, Inc. v. Regions Bank Trust Department*, 356 Ark. 494, 497, 156 S.W.3d 249, 252 (2004), our supreme court, quoting from *Fortenberry v. Frazier*, 5 Ark. 200, 202 (1843), stated:

> The inferior court is bound by the judgment or decree as the law of the case, and must carry it into execution according to the mandate. The inferior court cannot vary it, or judicially examine it for any other purpose than execution. It can give no other or further relief as to any matter decided by the Supreme Court, even where there is error apparent; or in any manner intermeddle with it further than to execute the mandate, and settle such matters as have been remanded, not adjudicated, by the Supreme Court.

Furthermore, in *Dolphin v. Wilson*, 335 Ark. 113, 119, 983 S.W.2d 113, 116 (1998), our supreme court also cited with approval from 5 Am. Jur. 2d § 791 where it is stated that "[a]ny proceedings on remand which are contrary to the directions contained in the mandate from the appellate court may be considered null and void."

Even more troubling is the majority's attempt to rationalize its decision by noting that Kight's children have been out of her home for more than three years and, therefore, "cannot be returned to the home in a reasonable amount of time," even though the majority observes that "the delay in this case is primarily attributable to ADHS and the trial court in erroneously terminating Kight's rights in the first place . . . ." The result of this reasoning by our court is that, simply by virtue of the lapse of time, DHS will ultimately prevail in every case in which the trial court commits error that is reversed on appeal and DHS chooses to ignore our mandate on remand.

Simply put, upon our remand of this case to the trial court with directions to "continue reunification services," the trial court was without jurisdiction to do anything but to order the continuation of services by DHS with the goal of reuniting Kight with her children. The court was not empowered to examine "whether" reunification services should be provided, and clearly the court lacked jurisdiction to consider a new petition by DHS seeking to terminate Kight's parental rights. Under *Dolphin, supra,* any proceedings conducted by the trial court that were contrary to the mandate were null and void. Kight's appeal challenging the trial court's jurisdiction under the doctrine of the law of the case was sufficient to also challenge the validity of the court's orders that terminated her parental rights contrary to this court's June 30, 2004, mandate, without having to also challenge whether there was sufficient evidence to support the trial court's unauthorized action.

With this court's opinion in *Kight II,* coupled with our denial of Kight's petition for rehearing, the trial courts are now at liberty to ignore this court's mandates in parental-termination cases, the rule of the law of the case is dead, and trial courts are free to take whatever action they may deem appropriate, notwithstanding our mandates' specific directives to the contrary.

I would grant the petition for rehearing and again remand this case to the trial court with instructions to comply with the mandate in *Kight I,* pursuant to the law of the case. I am authorized to say that Judge Hart joins in this dissenting opinion.