Krystal LEE and Alfred Lee *v.* ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 07-1270

285 S.W.3d 277

Court of Appeals of Arkansas
Opinion delivered May 28, 2008

---

*Melissa Dom Bratton*, Arkansas Public Defender Comm'n, for appellants.

*Gray Allen Turner* and *David Kirby Overton*, Office of Chief Counsel, for appellee.

*Leah Lanford*, attorney ad litem for the minor children.

LARRY D. VAUGHT, Judge. Appellants Krystal Lee and Alfred Lee appeal from an order of the Pulaski County Circuit Court terminating their parental rights to their thirteen-year-old daughter S.L. and to their fourteen-year-old son M.L. They argue that the circuit court erred in finding that there was sufficient evidence to support the termination of their parental rights, both as to grounds for the termination and that the termination is in the children's best interests. We affirm.

On March 11, 2006, the Department of Human Services (DHS) investigated a report that Father was using various illegal drugs, including methamphetamine, marijuana, and cocaine. In addition, Father had forced Mother and the children out of the home by threatening her. Father was verbally abusive toward the children in the presence of the police and a DHS worker. Because both children were terrified of returning home and Mother continued to deny Father's threat toward M.L., DHS placed a seventy-two-hour hold on both children. There was no prior history of involvement by DHS with this family.

On March 14, 2006, a petition for emergency custody was filed. That same date, an emergency order placed custody of the children with DHS. On April 13, 2006, a hearing was held where the circuit court found probable cause for entry of the emergency order.

After an adjudication hearing on April 25, 2006, the court found that both children were dependent-neglected. Specifically, the court found that the children had been subjected to aggravated circumstances because Father was a chronic drug user who battered Mother repeatedly in front of the children, pulled the children's hair, and subjected them to emotional abuse. The court

found that Mother failed to protect the children from Father's abuse and that the children had been subjected to extreme or repeated cruelty. Even so, the goal of the case was reunification. The parents were ordered to submit to psychological evaluations and follow the therapist's recommendations, attend parenting classes, submit to drug screens, and attend marital therapy. Father was ordered to submit to a drug-and-alcohol assessment, attend anger-management sessions, and refrain from possessing firearms; Mother was ordered to attend domestic-battery counseling. Supervised visitation was ordered for Mother only, but Father was not to have contact with the children except in the context of therapy.

On August 29, 2006, a review hearing was held. The court found that Mother did not start participating until a month earlier when Father went to jail on federal drug and firearm charges. The court authorized Mother's visitation with the children to be increased as recommended by the children's therapist. The goal continued to be reunification.

On January 23, 2007, a permanency-planning hearing was held. The court changed the goal to termination of parental rights. The court found that Father had made the decision not to comply with the court's orders and that Mother had done little, if anything, to distance herself from Father. Additionally, the court found that Mother had been burdening the children with her own "emotional baggage" in that she attempted to present the children with t-shirts similar to one she wore to the hearing that had pictures of the children and a caption that read "Kidjacked by the Dept. of Hell and Human Suffering." The court further found that, while Mother had substantially complied with the court's orders, it was not sufficient to return the children. Mother was noted to have been diagnosed with dependent- personality disorder.

On April 24, 2007, a termination-of-parental-rights hearing that had been set for that date was postponed because Father was being held for an evaluation in the pending criminal case. Instead, a permanency-planning hearing was held. The court found that there had been little, if any, progress since the previous hearing.

On July 17, 2007, the termination-of-parental-rights hearing was again postponed because Father was unavailable for the hearing and because Mother's attorney had been granted permission to withdraw from this case over an irrevocable breach of the attorney-client relationship.

On August 24, 2007, the termination-of-parental-rights hearing took place. Dr. Paul Deyoub, a forensic psychologist, testified that he conducted a psychological evaluation of Mother, with a diagnosis of dependent personality disorder. He also noted that Mother had a borderline IQ. According to Dr. Deyoub, this causes Mother to be unable to recognize the dysfunctional aspect of her relationship with Father and to expose the children to that dysfunction by not getting out of the relationship. He asserted that Mother's denials of abuse were not credible. This was a result of her failure, because of her personality disorder, to recognize the abuse. Dr. Deyoub recommended that Mother be required to end the marriage before the court considered returning the children to her. He added that the addicted husband that Mother described had no hope of being brought into compliance, especially in the short term.

Dr. Deyoub said that Mother, because she minimized Father's behavior, believed that the children were removed without justification. He also said that Mother somewhat blamed the children and other members of the family for the chaos in their lives, adding that Mother believed that the children were saying things to DHS that were not true. On examination by the court, Dr. Deyoub described Mother as still being dependent upon Father despite his incarceration because she was being loyal to him and not moving forward. He opined that Mother feared separation from Father and that Father's mental abuse went hand-in-hand with her personality disorder.

The court asked what inferences could be drawn from Mother's wearing the t-shirt to the hearing. Dr. Deyoub replied that such action was self-defeating and diminished the likelihood that Mother would be able to correct her deficiencies. He added that it undermined the children and showed that Mother was not responding to treatment. Dr. Deyoub stated that Mother's continued telephone contact with Father indicated that she was not appreciating the issue or interested in complying with the case.

Larry Starr, the therapist for both children before S.L. was assigned to a female therapist, testified that both children had adjustment issues with M.L. also having anger issues. He said that the children were emotionally healthy, considering what they had been through, and that this was a reflection of the maternal grandparents with whom they had been living since their removal from their parents. He added that there were also boundary issues to be addressed because Mother's conversations with the children

had been inappropriate at times. He gave as an example that Mother told M.L. that the grandparents were serving as foster parents for the children only because DHS was paying them. Starr said that Mother's attitude in making the statement was a barrier to reunification. He agreed with Dr. Deyoub that Mother was incapable of putting her children first by terminating her marriage. Starr said he believed that Mother wanted to reconnect with Father at some point in the future. He related that, when asked about choosing between her children and Father, she said it would depend upon whether Father had changed.

Starr indicated that there were considerations of terminating Mother's visitation because of the boundary issues. He reported that the children had expressed that they wanted to live with their grandparents while somehow maintaining a relationship with their mother. Starr said that, in order for this to happen, Mother would have to respect certain boundaries and have age-appropriate discussions with the children.

On examination by the court, Starr noted his disagreement with Dr. Deyoub by stating his belief that Mother had been physically abused. He noted that, if Mother would not separate herself from that abuse, it would be up to the court to protect the children. Starr also indicated that the inappropriate discussions harmed the children. He also worried that, if Mother did not divorce Father and she were allowed to have some type of relationship with the children, she would somehow interject Father into the children's lives.

Rosemary Dobbs, the caseworker formerly assigned to the case, testified that DHS was recommending that parental rights be terminated as to both parents. She said that Father had not complied at all with the case plan or court orders and that Mother, after some initial hesitation before Father was incarcerated, had complied by completing parenting classes, submitting to a psychological evaluation, and completing therapy. Dobbs said that Mother had been discharged by her therapist because she had achieved the maximum benefit from therapy. She noted that Mother had obtained and maintained stable housing and employment. She noted that there were persistent environmental issues in Mother's home that still needed to be addressed. On cross-examination, Dobbs stated that Mother was in the process of rectifying the problems with her home. She was unaware that Father had taken some parenting classes and acknowledged that no services had been provided to Father since his incarceration.

Wendy Childs, the adoption specialist, opined that, although she did not run a data search, the children were quite adoptable. She indicated that the foster parents were very interested in adopting the children.

Mother testified that, although Father had pulled her hair and had been verbally abusive, he had not been physically abusive to her. She admitted that she did not protect the children from Father's abuse but added that she did not believe that she had done anything to warrant having her children removed by DHS. On cross-examination, she stated that she did not want her rights terminated because she had complied with the court's orders. On examination by the court, Mother admitted that she was still married to Father, with no plans to divorce him. She also acknowledged seeing Father once or twice while he has been incarcerated.

Father testified that he was currently incarcerated in the Pulaski County jail on pending federal drug and firearms charges. Although he admitted that he had pulled Mother's hair and called her names, he denied hitting her. He said that he had been angry at times but denied needing help. He also denied hitting his children. He testified that he had been abused as a child but never sought help for it. Father said that he "possibly" had been emotionally abusive to Mother. He stated that he did not want his parental rights terminated and that it was "exaggerated" and "made up" that his children were afraid of him. On cross-examination, Father asserted that he had complied with the court's orders by taking and passing one drug screen, by completing one parenting class, and by "lining up" a job once he is released.

The circuit court ruled from the bench and terminated the parental rights of both parents. The court found that both parents lacked credibility regarding the minimizing of the abuse, as well as on Mother's testimony on the amount of contact she has had with Father. The court noted that Mother was failing to take responsibility for the abusive situation, as well as the environmental issues, and was blaming others such as DHS for those circumstances and that this was manifested by her wearing the shirt. The court asked rhetorically how a person could begin to resolve their problems if they did not acknowledge that there were problems. The court found that Mother's failure to take responsibility indicates that she has not benefitted from the services provided by DHS. DHS was found to have provided clear and convincing evidence that it was in the children's best interest to terminate parental rights and that the children are adoptable. The court also found that DHS had

provided clear and convincing evidence that both children had been adjudicated dependent-neglected and had continued out of the custody of the appellants for over twelve months and the conditions that caused the removal had not been remedied by the parents despite meaningful efforts by DHS; and that the parents had subjected the children to aggravated circumstances in that there was little likelihood that successful reunification would take place in a reasonable time. The court found that Mother still had not resolved the environmental-neglect issues. The court's order terminating appellant's parental rights was entered on September 20, 2007. On September 26, 2007, both appellants filed notices of appeal.

We review termination of parental rights cases de novo. *Yarborough v. Arkansas Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006). The grounds for termination of parental rights must be proven by clear and convincing evidence. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Kight v. Arkansas Dep't of Human Servs.*, 94 Ark. App. 400, 231 S.W.3d 103 (2006).

■ The parents first argue that the circuit court erred in finding that it was in the children's best interests for parental rights to be terminated. Specifically, they argue that DHS failed to show potential harm to the children if they were returned to their parents' home. According to Ark. Code Ann. § 9-27-341 (Repl. 2008), the circuit court was only required to *consider* the potential harm to the health and safety of a child that might result from continued contact with the parent. The court was not required to find that actual harm would result or to affirmatively identify a potential harm. Furthermore, the supreme court has directed that the harm analysis be conducted in broad terms, including the harm the child suffers from the lack of stability in a permanent home. *See Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d

397 (2001). Finally, the court's potential-harm inquiry is but one of many factors that a circuit court must consider in a best-interest analysis. *Id.*

In their second point, Mother and Father argue that DHS had failed to prove grounds for termination. It is undisputed that the children had been removed from their parents in March 2006 and had not returned at the time of the termination hearing in August 2007, a period in excess of twelve months. It is also undisputed that DHS provided services to the parties and that the conditions leading to the removal had not been corrected. Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(*a*) provides that this is a ground for termination of parental rights. In its order, the circuit court found that this ground, as well as another ground, had been proven. Only one ground is necessary to terminate parental rights. *Albright v. Arkansas Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007).

The parents argue that they had complied with the case plan and the court's orders. However, even full completion of a case plan is not determinative of the outcome of a petition to terminate parental rights. *Wright v. Arkansas Dep't of Human Servs.*, 83 Ark. App. 1, 115 S.W.3d 332 (2003). What matters is whether completion of the case plan achieved the intended result of making the parent capable of caring for the child. *Id.* Here, Mother was not capable of caring for the children because she had not addressed the environmental issues. She also had undermined some of the progress with her inappropriate discussion of the case with the children. Further, she has not accepted responsibility for the removal of the children or for failing to protect the children from Father. She also indicated that she would consider reconnecting with Father when he was released. Likewise, Father was not capable of caring for the children because of his abusive behavior and unwillingness to admit fault. Although he was incarcerated at the time of the hearing, it was uncertain how long his incarceration would last. He estimated that it would be no more than two years. As noted above, he had also failed to address the anger issues.

Mother also asks that she be given additional time to maintain and improve on the progress that she has made. The circuit court recognized that Mother had been cooperative and made progress but found that mere compliance with the directives of the court and DHS was not sufficient if the root cause of the

problem was not dealt with. Evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and to remedy the situation that caused the children to be removed in the first place. *Camarillo-Cox v. Arkansas Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). We cannot say that the circuit court was clearly erroneous in finding that grounds were proved and that the best interest of the children justified termination as to both parents.

Affirmed.

PITTMAN, C.J., ROBBINS, and MARSHALL, JJ., agree.

HART and HEFFLEY, JJ., dissent.

JOSEPHINE LINKER HART, Judge, dissenting. I agree that the trial court did not err in deciding to terminate Alfred Lee's parental rights. However, I find the majority decision to apply the same "extreme remedy" to the mother, Krystal Lee, completely unjustified by law or fact. Remarkably, this court has affirmed the termination of Krystal Lee's parental rights despite the fact that, by the majority's own reckoning, she has complied with the directives of the trial court and the Arkansas Department of Human Services. Moreover, Ms. Lee has obviously showed considerable parenting ability because she raised two children to teenage who by all evidence in this case are "emotionally healthy" and "great kids." Obviously, the case plan was not so much a roadmap to reunification as a moving target.

I ascribe the majority's decision in large part to its inability to use a calendar. First, the majority relies on the testimony of psychologist Paul Deyoub, which I contend is problematic in the extreme. Prior to the August 24, *2007*, termination hearing, Dr. Deyoub's only contact with Ms. Lee occurred when he conducted a psychological evaluation on August 8, *2006*. At that point, the mother had been separated from her husband for less than two weeks, when he opined that she had made "no appreciable progress to an independent lifestyle and would probably take up with another dominant figure even if the father did not return." Despite Deyoub's dire predictions, in the ensuing year since he evaluated Ms. Lee, she had lived independently, secured employment, and had not taken up with another dominant figure. The trial court had the benefit of 20/20 hindsight, but inexplicably failed to take advantage of it. The majority does not explain why it is proper in its de novo review to compound this error.

Likewise, the majority errs when it relies on *Camarillo-Cox v. Arkansas Department of Human Services,* 360 Ark. 340, 201 S.W.3d 391 (2005), as support for its holding. It suggests that Ms. Lee's compliance efforts were only manifest "as termination becomes more imminent." This holding is belied by the record. The adjudication hearing for the two teenage children in this case was held on April 25, 2006, but the actual adjudication order was not filed for record until May 22, 2006. The first review hearing was held on August 29, 2006, and the review order states that the mother had been cooperating for "approximately a month." The mother continued to "cooperate," completed the case plan, and remained in compliance right up until termination of her rights. This means that her supposedly dilatory "improvement" manifested in a matter of few weeks after the adjudication. Accordingly, this case is not at all like *Trout v. Arkansas Department of Human Services,* 359 Ark. 283,197 S.W.3d 486 (2004), and its progeny, where the appellate courts of this state have held that last-minute cooperation is insufficient.

The majority's finding that "Mother was not capable of caring for the children because she had not addressed the environmental issues" is no more sound. Environmental neglect was not the reason for removal of the teenage children and rectifying "environmental issues" was never part of the case plan. Accordingly, while the case plan is but a moving target, the asserted grounds of "environmental issues" is but a mirage.

Although the majority cites *Kight v. Arkansas Department of Human Services,* 94 Ark. App. 400, 231 S.W.3d 103 (2006), for the proposition that termination of parental rights is an "extreme remedy," glaringly absent is any consideration, by either the trial court or the majority, of what action might be utilized to protect the children short of this "extreme remedy."

Because we have terminated the parental rights of Alfred Lee, who is currently serving a prison sentence for drug offenses, these teenage children will almost certainly not be at risk for the remainder of their minority, when and if their father is released from prison during that time. Upon termination of Alfred's parental rights, the children came under the protection of the criminal-justice system. Arkansas Code Annotated section 5-26-502 (Repl. 2006) would impose criminal liability on Ms. Lee if she "accept or acquiesce" in Alfred Lee taking any physical custody of the teenage children. Additionally, the trial court had at its disposal its contempt power to ensure that Alfred did not ever again

victimize the children. Whether or not Ms. Lee chose to continue her relationship with her husband was none of the State's business, and I deplore the fact that this court has ratified such an unjustified intrusion into her personal life.

Finally, I cannot ignore the fact that the goal in this case was changed from reunification to termination of parental rights only after Ms. Lee protested ADHS's decision to retain custody of her teenage children. When she proved to be much more than the door mat that Dr. Deyoub imagined her to be, ADHS — and the trial court — punished her brutally for her insolence. To this court's ever-lasting shame, it affirmed.

HEFFLEY, J., joins.