
# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–13–944

| | |
|---|---|
| CASSIE LACKEY DORNAN<br>APPELLANT | **Opinion Delivered** June 4, 2014 |
| V. | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. JV2012-268-3] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br>APPELLEES | HONORABLE THOMAS SMITH, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Judge

Cassie Lackey Dornan brings this appeal from an order granting a petition of the Arkansas Department of Human Services (ADHS or department) to terminate her parental rights and those of Michael Lackey, her ex-husband, to their two children. The juveniles—S.L., born on December 22, 2004, and M.L, born on December 10, 2005—had not lived with appellant after she lost custody to Mr. Lackey in a 2009 domestic-relations case. The present ADHS case began in 2012, when S.L. and M.L. were living with Mr. Lackey, Wilma Boyd, and Ms. Boyd's three minor children in Lowell, Arkansas, and appellant resided with her husband and her stepdaughter in Oklahoma. The termination hearing against appellant and Mr. Lackey, conducted on June 11, 2013, took place simultaneously with a separate case to terminate Ms. Boyd's parental rights to her children. The circuit court entered its order terminating the parental rights of appellant and Mr. Lackey to S.L. and M.L.

SLIP OPINION

on July 26, 2013.[1]  An amended order was entered on August 13, 2013.  Appellant timely

appealed those orders to this court.  She raises one point on appeal, challenging the sufficiency

of the evidence to terminate her parental rights.  We affirm.

Arkansas Code Annotated section 9–27–341(b)(3) (Supp. 2013) requires an order

terminating parental rights to be based upon clear and convincing evidence. First, section 9–

27–341(b)(3)(A) requires a finding by clear and convincing evidence that termination is in the

best interest of the juveniles, including consideration of the likelihood that they will be

adopted and the potential harm caused by returning custody of them to the parent.  Next, the

order terminating parental rights must be based on a showing of clear and convincing

evidence as to one or more of nine grounds for termination listed in section 9-27-

341(b)(3)(B).  In the present case, the order of termination was based on the following

statutory grounds:

> (i)(a) That a juvenile has been adjudicated by the court to be dependent–neglected and
> has continued to be out of the custody of the parent for twelve (12) months and,
> despite a meaningful effort by the department to rehabilitate the parent and correct the
> conditions that caused removal, those conditions have not been remedied by the
> parent.
> . . . .
>
> (ii)(a) The juvenile has lived outside the home of the parent for a period of twelve (12)
> months, and the parent has willfully failed to provide significant material support in
> accordance with the parent's means or to maintain meaningful contact with the
> juvenile.
>   (b) To find willful failure to maintain meaningful contact, it must be shown that
> the parent was not prevented from visiting or having contact with the juvenile by the

---

[1]Mr. Lackey voluntarily relinquished his parental rights midway through the
termination hearing and did not revoke his consent within ten day; he is not a party to this
appeal.

SLIP OPINION

juvenile's custodian or any other person, taking into consideration the distance of the juvenile's placement from the parent's home.

. . . .

(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

. . . .

(ix)(a) The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

. . . .

(3)(A) Have subjected any juvenile to aggravated circumstances.

Ark. Code Ann. § 9–27–341(b)(3)(B). "Aggravated circumstances" includes a determination that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*)(*3*)(*B*).

The purpose of the code is to provide permanency in the child's life where return to the parents is contrary to the child's health, safety, or welfare and it appears that return cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013); *Cotton v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 455, 422 S.W.3d 130. "A parent's resumption of contact . . . following the permanency planning hearing and preceding the termination of parental rights hearing is an insufficient reason to not terminate parental rights." Ark. Code Ann. § 9-27-341(a)(4)(A) (Supp. 2013).

Appellant does not challenge the circuit court's finding that termination was in the best interest of the juveniles, including consideration of the likelihood that the juvenile will be

adopted and of the potential harm that would be caused by returning the child to the parent's custody. She challenges only the sufficiency of the evidence to support the circuit court's finding of statutory grounds on which to terminate her parental rights.

Our review of termination-of-parental-rights cases is de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Grounds for termination of parental rights must be proved by clear and convincing evidence, which is such a degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Hughes v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 526. When the burden of proving a disputed fact is by clear and convincing evidence, our inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.*

While appellant was married to Mr. Lackey, ADHS investigated an October 2005 incident in which bleach was spilled on M.L. The department made a true finding against appellant for inadequate supervision and opened a protective-services case due to environmental concerns of roach infestation, swarming flies, and general uncleanliness in the home. In November 2005, a seventy-two-hour hold was executed on S.L. because of the parents' inadequate explanation that she fractured her arm while in her playpen and the department's concerns about the safety of the home; the family had relocated after October to a home with sagging floors and roach infestation, and they were using electric heaters instead of the gas heater because the gas had been shut off. ADHS assumed custody of S.L. and provided services to the family. In September 2007, the court entered an order of

dismissal and ordered ADHS to close its case. Custody was returned to appellant on the court's finding that she had complied with case-plan goals, that S.L. had done well since being returned to appellant in December 2006, and that appellant had maintained stability for the juvenile and herself.[2] The court noted that Mr. Lackey was in jail at the time and would be allowed to petition for visitation upon his release.

Appellant and Mr. Lackey divorced, and appellant remarried. A domestic-relations order of 2009 reflects that she lost custody of S.L. and M.L. to Mr. Lackey on a finding that she was in contempt of the court's orders (apparently, contempt of visitation orders).

The procedural history of the present ADHS case began in April 2012. Mr. Lackey and Ms. Boyd were arrested on five counts of endangering the welfare of a child, and ADHS exercised a seventy-two-hour emergency hold on the Boyd and Lackey children because of immediate danger to their health or physical well-being. The hold on S.L. and M.L. was due to the absence of a legal caretaker, environmental neglect, and a pending no-contact order between Mr. Lackey and the children. On April 16, 2012, the circuit court entered an ex parte emergency order placing custody of S.L. and M.L. with ADHS.

At a probable-cause hearing on April 23, 2012, appellant appeared pro se and Mr. Lackey appeared with his attorney. The circuit court made the following finding in its written order:

Pursuant to a stipulation of the parties, the Court finds that there is probable cause that

---

[2]Appellant reported to Dr. Martain Faitak, who performed a psychological evaluation of appellant in 2006, that ADHS also had taken custody of M.L. after her birth. This is not evident in the 2007 dismissal order.

the emergency conditions which necessitated removal of the juveniles from the custody of the father continue so that it is necessary that the juveniles continue in the custody of [ADHS] and it is contrary to the welfare of the juveniles to be returned home and it is in the best interests of the juveniles to remain in the custody of [ADHS].

The court reserved a finding as to reasonable efforts until the adjudication hearing.

At the adjudication hearing in June 2012, appellant again appeared pro se and Mr. Lackey appeared with his attorney. The court's written order included its finding that ADHS was previously involved with the family, most recently from February 2011 to July 2011, from January 2012 to March 2012, and again beginning on April 12, 2012. The court found that services provided to the family—including worker visits, head-lice kits, cleaning supplies, and homemaker services—were reasonable but did not prevent removal, as shown by Mr. Lackey's arrest for endangering the welfare of a minor due to the environment of the home. The court adjudicated S.L. and M.L. dependent-neglected, specifically finding that Mr. Lackey stipulated to dependency-neglect for environmental neglect and inadequate supervision. The court found that return "to the custody of the parents" was contrary to the juveniles' welfare and that continuation of custody in ADHS was in their best interest and necessary to the protection of their health and safety. The goal of the case was set as reunification with Mr. Lackey.

At the review hearing of September 2012, appellant again appeared pro se and Mr. Lackey appeared with his attorney. The court found that ADHS had made reasonable efforts to provide family services to achieve the goal of the case and that the case plan was moving toward an appropriate permanency plan. ADHS was authorized to arrange appropriate

6

visitation and was ordered to explore ICPC[3] placement with relatives. A written order following the December 2012 review hearing reflects that Mr. Lackey appeared with his attorney; it does not note the presence or absence of appellant. The goal of the case was "reunification with the parents." The court noted that the case plan was moving toward an appropriate permanency plan and that Mr. Lackey was complying with the case plan. ADHS was again authorized to arrange appropriate visitation, and orders of the court that did not conflict with the present order were to remain in effect. At the permanency-planning hearing on March 5, 2013, appellant appeared pro se and Mr. Lackey appeared with his attorney. The goal of the case was set as reunification with a concurrent goal of adoption, and the court ordered that an attorney be appointed for appellant.

*Petition to Terminate*

ADHS filed its petition to terminate the parental rights of appellant and Mr. Lackey on March 28, 2013. ADHS asserted that S.L. and M.L. were adoptable and that they faced potential harm affecting their health and safety should they be returned to the custody of the parents. The petition set forth two statutory grounds for termination:

> That the juveniles have been adjudicated by the court to be dependent-neglected and have continued to be out of the custody of the father for twelve (12) months and, despite a meaningful effort by the Department to rehabilitate the father and correct the conditions that caused removal, those conditions have not been remedied by the father . . .

[and]

> *The parents have subjected the Juveniles to aggravated circumstances. Specifically,*

---

[3]Interstate Compact on the Placement of Children

(A) The Department initiated a 72 hour hold on [S.L. and M.L.], on April 13, 2012, after the Lowell Police Department arrested Michael Lackey, the father, and charged [him] with five counts of endangering the welfare of a minor 2d degree. At the time of the hold, the Department had concerns for the safety and well-being of the children due to the uncleanliness of the home, the absence of a legal caretaker, and . . .

(B) On June 12, 2012, the court adjudicated the juveniles dependent-neglected. At the time, the father, Michael Lackey, stipulated to dependency-neglect for environmental neglect and inadequate supervision.

. . . .

(E) Since 2005, the Department of Human Services has made several true findings against the family and has provided services to the family through court involved and protective service cases. Specifically,

> (1) In October 2005, the Department made a true finding against Cassie Lackey, the mother, for inadequate supervision. Clorox bleach spilled on the juvenile, S.L., who was 10 months old at the time. The Department opened a protective services case at that time due to environmental concerns of the home. . . During this protective service case, the Department provided homemaker services and a referral for food stamps.

> (2) In November 2005, the Department initiated a 72 hour hold on the juvenile [S.L.] due to the juvenile sustaining a buckle fracture to her arm and the parents not providing an adequate explanation to how the injuries occurred. Also, the Department had concerns about the safety of the home. . . . .

(G) Cassie Lackey, the mother, currently lives in [Wyandotte], Oklahoma. She had the children removed from her custody in 2009 due to environmental reasons [sic]. During this case, the Department found that Cassie Lackey's home was not appropriate for placement of the children.[4] Furthermore, *the mother has not had regular visits with the*

---

[4]This finding is not borne out by the evidence.



*children since they came in to care.*

> (H)  At this time, the Department does not believe that Michael or Cassie Lackey can provide a healthy, safe, and permanent home for the juveniles.  Both of the parents have a history with the Department and the Department has concerns with the environment that the children will reside in if custody is returned to either parent.  The children . . . have continued to improve academically since coming into care and remain healthy.  Their social skills have also improved since removal from their parents in April 2012.

(Emphasis added.)

*Hearing to Terminate Parental Rights*

Witnesses at the termination hearing included Mr. Lackey; Regina Edster, the counselor for S.L. and M.L.; Brandon Robinson, the family services caseworker and investigator in the case; Lisa Harte, ADHS program assistant; appellant; and Carol Dearing, appellant's aunt.  Mr. Lackey testified that he never denied visitation to appellant; that she saw the children only twice in four years, except for a week before the case was opened when she stayed with her aunt and saw them daily; and that appellant talked to the children only a couple of times by phone.

Ms. Edster, counselor for the children, noted the three-year lack of contact between appellant and the children and opined that the children were not bonded with appellant.  She said that the children could be at risk of developing reactive attachment disorder if they were placed with appellant; that, should reunification be ordered, it would be in the children's best interest to reintroduce them slowly; and that an extended time period would be needed, such as a year and a half even with "the girls moving in lockstep" and "if everything works for them psychologically, and it's all good."

9

Mr. Robinson, the caseworker, testified that S.L. and M.L. did not initially recognize appellant as their mother when he supervised visitation beginning in May 2012, after he received approval from Ms. Edster to allow it. He said that after three initial visits, appellant "would show up at court and . . . ask for a visitation" at times that had not been arranged because ADHS had not been notified and did not know that she would be there. He said that he had directed appellant to contact the program assistant, who typically would call him to say that a visit was being set up, but he never heard that appellant called the program assistant. He said that appellant participated minimally until after the permanency-planning hearing, when she began calling him two to three times daily to ask about the ICPC evaluation—which had not come back at the time of the termination hearing although he had referred it in January.

Mr. Robinson stated that ADHS was recommending termination of appellant's parental rights as to M.L. and S.L. for the following reasons:

> That recommendation . . . comes from level of commitment, the bond that the girls have. At this point in time, they haven't seen their mother consistently for three, almost four years. Therefore, we think we would see a lot of regression in the girls in their development if they were to be placed with their mother. In any case, to work them up to reunification with the mother it could take another year and a half.
> S.L. and M.L. are adoptable. Someone has expressed an interest in adopting S.L. and M.L. I do not see any reason at this time that those people that have expressed an interest wouldn't be able to adopt.

He acknowledged that his permanency-planning-hearing report did not mention appellant or make any recommendation regarding her, and he said that his failure to include a recommendation about her in his termination-hearing report was an honest mistake. He acknowledged that the three initial visits and the ICPC referral were "about all the

10

department has done to help or even look into this non-offending parent."

Carol Dearing, appellant's aunt, testified that appellant left S.L. and M.L. in her care for three-and-a-half months when appellant was the custodial parent; that the only conversation appellant and Dearing had during that time was when appellant phoned and told her not to allow visitation with Mr. Lackey, who had visitation rights; and that appellant went home to Oklahoma after leaving the children. Ms. Dearing also testified that appellant saw the children once or twice after Mr. Lackey obtained custody, that he told Ms. Dearing that appellant could see them, and that he never refused appellant a visit.

Appellant testified that Mr. Lackey would not let her see the children at all for more than two years; she denied having anything to do with the incidents in which S.L.'s arm was fractured and bleach was spilled on M.L., denied saying that S.L. broke her wrist in the playpen, and claimed to know that Mr. Lackey had broken it. She testified that she left the children with her aunt only for a day and a half. She presented evidence and documentation that she had attended parenting classes on her own and that the Housing Authority of the Peoria Tribe inspected her home and ranked her housekeeping in the top category, "good."[5]

Appellant's mother-in-law, Rebecca Dornan, testified that appellant kept the house clean, got her stepdaughter ready for school each day, walked her to school, and volunteered in classroom activities. Ms. Dornan and Mary Mossmayer, appellant's sister-in-law, testified that Mr. Robinson cancelled visitation on two occasions; the second time was just minutes

---

[5]Appellant testified that she lived in Indian housing with rent "subsidized by the tribe through my husband."

before the three women were to leave for the drive to Arkansas, and they made the trip anyway to talk to someone about the case.

At the conclusion of the hearing, the circuit court asked ADHS to state its basis for terminating appellant's parental rights:

> ADHS ATTORNEY: Because she has . . . demonstrated, subsequent to the initial hold, that she is unwilling or unable to remedy the conditions that brought [the juveniles] into care. Your Honor, she didn't have custody, but she hadn't seen them. She doesn't have any bond.
>
> THE COURT: Under the case plan, what was she supposed to remedy?
>
> ADHS ATTORNEY: Well, under the case plan, she was at least supposed to be involved. I don't know if that is listed in the case plan, per se. I don't know that we set up any services for her, but she did not request any. She wasn't requesting any sort of visitation.
>
> THE COURT: So, the theory I'm hearing then is either (1) she didn't know what she was supposed to do; or (2) you didn't think she had to do anything. Or, you knew, but didn't think we needed it to be put in the case plan. That's my concern here.
>
> ADHS ATTORNEY: No, Your Honor, she knew she had to—if she was a mother, if she was invested in these children, she would've stepped forward and said, "I want visitations." And would've been there consistently. Because if she was a mother saying, I want to be involved, I want to be involved, I want to be involved, that would be one thing. But it's not. This is a mother that is just sitting there and saying, well, you know, it's not really that big a deal.

Appellant's attorney responded that ADHS "did not tell her anything to do," hardly acknowledged her, and made no reports on her; that because she was the non-offending parent, appellant was not mentioned to any effect in any orders until the permanency-planning order required that an attorney be appointed for her; and that it was ADHS that had fallen down on the job. The attorney ad litem responded that regardless of who was at fault for the lack of visitation, contact had been minimal; the children, then eight and seven years

12

old, did not know appellant; and—according to their counselor—there was no bond and reunification would take a year-and-a-half to be therapeutically safe. The attorney ad litem concluded that the children's emotional health demanded that appellant's parental rights be terminated.

The court orally ruled that, although appellant was not treated properly in the way the case came about, the children had not been in her care for half of their lives. It found appellant's testimony not to be credible about anyone keeping her from seeing S.L. and M.L. and about not leaving them with her aunt for three-and-a-half months. The court found that the children needed permanency, that the damage from years before the case began could not be repaired within a reasonable amount of time, and that the case would be "totally different" had appellant seen her children for three years before the case started, which was of concern to the court.

*Written Order Terminating Parental Rights*

In its amended written order terminating the parental rights of appellant and Mr. Lackey, the circuit court found termination in the best interest of the juveniles, including consideration of the risk of potential harm that would be caused by returning custody to either or both parents. Regarding appellant, the court found that the children had not been in her care for the majority of their lives; appellant lost custody in 2005, regained it, lost it again in 2009, and had only very limited contact since; her testimony was "not credible regarding her statements that [contrary testimonies] regarding her willful lack of contact with the children and past incidents of improper care and neglect are a lie"; and if the children were to be

13

returned to appellant's care, the transition "would require at least a year, a substantial period of time in the lives of the juveniles."

The order then found by clear and convincing evidence the existence of four statutory grounds for termination. The first statutory ground was section 9–27–341(b)(3)(B)(i)(a), that the juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent. With respect to appellant, the court found that the children had been out of her custody since 2009; she was currently living in Oklahoma and had not "maintained contact with the department or her children throughout this case"; and her overtures in the final months of the case to establish visitation were insufficient to prevent termination, considering her lack of action during the case and lack of contact with the children from 2009 until initiation of the case.

The second statutory ground that the circuit court found was section 9–27–341(b)(3)(B)(ii)(a)–(b): the juvenile has lived outside the home of the parent for a period of twelve months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile. The circuit court found that appellant had not maintained meaningful contact with her children during the case; she did not consistently request visitation subsequent to visitations within the first months of the case; her overtures in the final months of the case to establish visitation were insufficient to prevent termination; incredibly, she attributed her failure to maintain

14

SLIP OPINION

meaningful contact to intervention by Mr. Lackey; and her failure to maintain meaningful contact was willful, and she was not prevented from having contact after losing custody in 2009.

The third ground was section 9-27-341(b)(3)(B)(vii)(*a*): other factors or issues arose subsequent to the filing of the original petition for dependency-neglect demonstrating that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent. Regarding appellant, the court found that she had not maintained consistent contact with the department or her children throughout the case.

The fourth and final ground for termination was section 9-27-341(b)(3)(B)(ix)(*a*)(*3*)(*A*)(*B*)(*i*), the existence of aggravated circumstances, specifically, that there was little likelihood that services to the family would result in successful reunification. The court found that transitioning the children to a life with appellant would delay permanency for the juveniles for an unreasonable time, and that the long transition directly resulted from her willful failure to maintain meaningful contact since 2009 and failure to consistently participate in proceedings of the case.

*Argument on Appeal*

Appellant asserts that three of the four statutory grounds on which the circuit court terminated her parental rights were not properly alleged against her in the petition to

15

terminate: specifically, the failure-to-remedy-conditions ground was alleged only against Mr. Lackey,[6] and there were no allegations at all of failure-to-maintain-meaningful-contact and other-factors grounds. She argues that the only remaining statutory ground, aggravated circumstances, did not specify which of numerous bases in the petition applied to her. She concedes that she did not have regular contact with S.L. and M.L. after the 2009 change-of-custody order but argues that this is an improper basis for a finding of aggravated circumstances. She concludes that the finding of aggravated circumstances was not supported by clear and convincing evidence.

Due process demands that a parent be notified of the grounds that may constitute a basis for termination; at a minimum, it requires notice reasonably calculated to afford a natural parent the opportunity to be heard prior to termination of his or her parental rights. *Jones v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 632; *see Jackson v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 411, --- S.W.3d ---- (reversing because Jackson was not placed on notice that he must defend on a particular ground on which termination was based: the department never specifically argued that the trial court should rely on the ground, the trial court took the matter under advisement without ruling from the bench, and the first specific mention of this ground was in the trial court's order terminating parental rights) (citing *Kight v. Ark. Dep't of Human Servs.*, 94 Ark. App. 400, 409, 231 S.W.3d 103, 109 (2006)). Here, we agree that the

---

[6]Appellant argues that termination could not properly be based on a 2005 case against her that had been closed. She points out that the juveniles were not removed from her custody in this matter but were removed from Mr. Lackey and Ms. Boyd because of neglect and hazardous environmental conditions of their home.

first three statutory grounds found by the circuit court cannot sustain the termination of appellant's parental rights because she was not placed on notice that she must defend against them.

ADHS alleged in its petition the ground of aggravated circumstances as the fourth basis of termination. Appellant now argues, echoing her previous due-process arguments, that she was required to guess what evidence would be produced at the hearing based on the mere citation to the many-faceted statute. We do not agree. The petition specifically alleged as proof of this ground that appellant had not had regular visits with the children since they came into care. Moreover, appellant did not object at the hearing to testimony on her lack of visitation. *See Anthony v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 556 (permitting the introduction of proof on an issue, even if not raised in the pleadings, constitutes an implied consent to trial on that issue). Finally, appellant put on her own evidence regarding her efforts to visit—albeit evidence that the circuit court found incredible.

The circuit court found by clear and convincing evidence the existence of aggravated circumstances. Specifically, the court found little likelihood that services to the family would result in successful reunification. With regard to appellant, the court found transitioning the children to a life with her would delay permanency for the juveniles for an unreasonable time, and that the long transition directly resulted from her willful failure to maintain meaningful contact since 2009 and failure to consistently participate in proceedings of the case. These findings turned on the court's evaluation of the evidence and credibility of the testimony, exemplified by his oral explanation that he found appellant's testimony not credible that other

persons prevented her from seeing S.L. and M.L. and that she did not leave them with her aunt for three-and-a-half months; that damage from years before the case began could not be repaired within a reasonable amount of time; and that the case would be different had appellant been seeing her children in the three years before the case started.

We find no clear error, and we affirm the termination of appellant's parental rights based on the statutory ground of aggravated circumstances.

Affirmed.

WHITEAKER, J., agrees.

GLOVER, J., concurs.

**DAVID M. GLOVER, Judge, concurring.** Clearly, I agree with the majority that there is sufficient evidence to support the circuit court's termination of Cassie Dornan's parental rights. I write separately to express my disdain for the manner in which ADHS handled Dornan's case throughout the process.

The girls were removed from Lackey's care, the offending parent, due to the conditions in which they were living. Reunification with Lackey was, and continued to be, the goal, and ADHS provided services to him. Meanwhile, Dornan, the non-offending parent, was essentially ignored by ADHS, even though she attended almost all of the hearings, albeit unrepresented until the end of this case. Specifically, the caseworker's testimony at the termination hearing was that three visitations and an ICPC referral—the status of which was unknown at the time of the termination hearing—were "about all" that had been provided to Dornan. Since Dornan lived in Oklahoma, ADHS could not provide some services; however, there was no documented effort that any meaningful attempt was even made to coordinate services for Dornan with

18

Oklahoma's Department of Human Services. Dornan's own testimony at the termination hearing was that the caseworker had cancelled her visitation with the children on two occasions, and then he would not answer Dornan's phone calls. Dornan further testified that although she had asked for an ICPC referral, no one had visited her home.

This case began in April 2012. A petition to terminate both Lackey's and Dornan's parental rights was filed by ADHS in March 2013. In the petition to terminate, two grounds were alleged—(1) that the children were adjudicated dependent-neglected and had continued out of Lackey's home for twelve months and, despite a meaningful effort by DHS to rehabilitate Lackey and correct the conditions that caused removal, those conditions had not been remedied by Lackey, and (2) that the parents had subjected the children to aggravated circumstances. Under both of these allegations, the only stated information as to Dornan was she currently lived in Oklahoma, the children were removed from her custody in 2009 due to environmental reasons, ADHS had determined in the present case that her home was not an appropriate placement for the children, and Dornan had not had regular visits with the children since they came into care. Against a CASA report stating that the children were removed from Dornan's custody in 2009 due to environmental reasons, both Dornan and Lackey testified custody was removed from Dornan and placed with Lackey in 2009 after Lackey filed contempt proceedings in a domestic-relations case against Dornan for refusing to allow him to see his daughters. No evidence was offered that Dornan's home had been deemed by ADHS to be an inappropriate placement for the girls (especially in light of the fact that Dornan testified that no one had even visited her house or looked at the pictures of her home that she had brought to court early in the proceedings).

ADHS cites the fact of Dornan not having regular visits with the children since they came into care as a reason to terminate her parental rights. Here are the facts: ADHS takes Dornan's children into its custody; Dornan lives in another state but manages to appear at almost all of the hearings related to this matter; ADHS provides virtually no services, including visitation, for Dornan; and, for all intents and purposes, ADHS completely ignores that Dornan even exists as the biological mother of these children.

The colloquy between the circuit court and the attorney for ADHS set forth in the majority's opinion is particularly telling—when asked the basis for terminating Dornan's parental rights, the attorney for ADHS initially stated that Dornan had been unwilling or unable to remedy the conditions that brought her daughters into care, but then backtracked and stated that Dornan did not have custody, had not seen the children, and there was no bond there. When further questioned by the circuit court as to what exactly Dornan was supposed to remedy under the case plan, the ADHS attorney replied that "she was at least supposed to be involved," then admitted that he did not know if that was in the case plan. The ADHS attorney also admitted that he did not know if ADHS set up any services for Dornan, but "she did not request any" and she had not requested any visitation. He claimed that if Dornan "was a mother" who was "invested" in her children, then she would have been saying that she wanted to be involved, instead of "just sitting there" as if it were "no big deal."

I find ADHS's attitude shown by the record in this matter to be arrogant and repugnant. Dornan and her current husband are both on disability and receive a total of a little over $1000 each month on which to live and are living in eastern Oklahoma. While I agree that Dornan had some responsibility to be active in this case, I do find that she put forth the effort to be

20

present at almost all of the hearings in this case, traveling from Oklahoma to Benton County without any help from ADHS; yet she was never considered by ADHS to be any part of the case, much less an important part of the case. Just as effort from Dornan was necessary, effort on the part of ADHS was also necessary; however, ADHS "efforts" were all but nonexistent. How is Dornan supposed to know what to do, how to act, or what to ask for if ADHS never made her an integral part of the case? Surely, it is not ADHS's position now that ADHS is not required to provide services to a parent unless the parent requests services. How are parents supposed to know the services available to them and how to facilitate the provision of these services? Under the law, this is not the parents' burden. ADHS simply may not abdicate its responsibility (for providing services to both offending and non-offending parents that would possibly allow for the reunification of the children with either one or both of the biological parents) just because the parents fail to request services. Any services provided by ADHS to Dornan might not have been enough to overcome the significant period of time that she had not been in her children's lives prior to the children being taken into ADHS custody; however, applying the "best interests" standard, as both the trial court and this court must do, as a result of ADHS's shortcomings with regard to its failure to provide services to Dornan, we will never know the answer to this question.

For my last point, the circuit court found four statutory grounds for terminating parental rights, although only two grounds had been pled in the petition to terminate parental rights. One of the grounds found by the trial court that was not pled in the termination petition was that the children had lived outside the home of the parent for a period of twelve months and the parent had willfully failed to provide significant material support in accordance with the

21

parent's means or to maintain meaningful contact with the children. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a)–(b) (Repl. 2009). If Dornan's lack of visitation with the children, both prior to the case being opened and during the pendency of the case, was of such utmost importance to ADHS, then why was this specific ground not pled by ADHS in its petition for termination of parental rights, thereby providing Dornan notice that her lack of meaningful contact with her children was a basis for terminating her parental rights?

In fairness, I realize that ADHS and its resources are stretched thinly. Even so, that is no excuse to allow parents to be marginalized and placed on the back burner in a case just because he or she is a non-offending parent, the parent lives out of state, or services are more difficult to provide. Although ADHS does an outstanding job in most cases, that simply was not done here. Many of the issues developed in this case, and substantial additional deliberation by this panel, could have been avoided if ADHS had just properly done its job, provided services to Dornan, and had specifically included her failure to visit as a ground for termination.

*Deborah R. Sallings*, Arkansas Public Defender Commission, for appellant.

*Tabitha B. McNulty*, County Legal Operations; and *Chrestman Group, PLLC*, by: *Keith Chrestman*, for appellees.